UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 00-12231-RWZ
and NO. 01-10178-RWZ

CYTOLOGIX CORPORATION

v.

VENTANA MEDICAL SYSTEMS, INC.

<u>MEMORANDUM OF DECISION</u>

July 20, 2006

ZOBEL, D.J.

Plaintiff CytoLogix Corporation sued defendant Ventana Medical Systems, Inc.,

asserting patent infringement, antitrust, and various state law claims.  The action arises

out of defendant's sale and marketing of devices that automate certain staining

procedures performed by pathology laboratories.  The complaint describes a market of

pathology laboratories that examine tissue specimens ("histology market"), with a

submarket for automated staining devices used in the "back end" of such labs ("back

end histology market"), which in turn is made up of submarkets for Special staining,

IHC staining, and ISH staining.  In approximately 1996, plaintiff made plans to enter the

Special submarket and the IHC submarket.  Plaintiff contends that defendant, which

was at the time dominant in the IHC submarket, learned of its plans and engaged in

exclusionary conduct to bar plaintiff's entry into the field.

On December 22, 2003, a jury found infringement of all of the asserted claims of

plaintiff's patents, but ruled in favor of defendant on plaintiff's trade secret claims,

thereby extinguishing Counts 1-3 of the complaint.  On appeal, the Federal Circuit

affirmed with respect to some claims, reversed with respect to one claim, and

remanded on the issue of obviousness with respect to some claims.  CytoLogix Corp. v.

Ventana Medical Sys., Inc., 424 F.3d 1168 (Fed. Cir. 2005). Defendant now moves for

summary judgment on the remaining counts of the complaint, and plaintiff opposes.

Summary judgment under Fed. R. Civ. P. 56 is appropriate if—viewing the evidence in

the light most favorable to plaintiff and drawing all reasonable inferences in his

favor—no genuine issue of material fact remains.  See Casas Office Machs., Inc. v.

Mita Copystar Am., Inc., 42 F.3d 668, 684 (1st Cir. 1994).

I.      Unfair Competition (Count 4)

        Count 4 alleges unfair competition.  Under Massachusetts law, "the gravamen of

an unfair competition claim is the likelihood of consumer confusion as to the source of

the goods or services."  Open Software Foundation, Inc. v. U.S. Fidelity & Guaranty,

Co., 307 F.3d 11, 17 (1st Cir. 2002) (internal quotation marks omitted).  A plaintiff

alleging unfair competition must thus demonstrate either "palming off," defined as "an

attempt by one person to induce customers to believe that his products are actually

those of another," or the plaintiff must demonstrate "that the features of the product in

question have acquired a secondary meaning such that confusion as to its source is

likely to arise if defendant is allowed to copy them."  Kazmaier v. Wooten, 761 F.2d 46,

52 (1st Cir. 1985) (internal quotation marks and emphasis omitted).  Plaintiff has made

no allegations concerning consumer confusion in the instant case.  In its summary

judgment papers, plaintiff argues only that it is unclear whether Massachusetts would

follow the Restatement (Third) of Unfair Competition and recognize additional conduct as falling within the ambit of common law unfair competition.  (Pl.'s Opp. 24-25). Plaintiff cites no law to support this possibility, nor any law contradicting the First Circuit and Massachusetts precedent limiting unfair competition to cases involving consumer confusion.  Accordingly, Count 4 is dismissed.

II.     M.G.L. c. 93A (Count 5)

Count 5 alleges violation of M.G.L. c. 93A on grounds that defendant improperly obtained plaintiff's business plan and trade secrets with the intention of converting them to its own use.  (Am. Compl. ¶ 42).  Defendant previously moved to dismiss Count 5 because the acts complained of did not occur "substantially and primarily" in Massachusetts, as required by M.G.L. c. 93A, § 11.  That motion was denied without opinion by the judge who previously presided over this case on June 18, 2002.  (Docket #107).  Defendant now renews its motion for summary judgment.  The motion is allowed because the underlying claims—misappropriation of plaintiff's business plan and trade secrets—were extinguished by virtue of the jury's verdict and a 93A claim must fail where the underlying claims fail.  See, e.g., Pimental v. Wachovia Mortgage Corp., 411 F. Supp. 2d 32, 40 (D. Mass. 2006).

III.    Unjust Enrichment (Count 6)

Count 6 claims unjust enrichment based on alleged wrongful conduct underlying three other claims: (1) misappropriation of plaintiff's business plan (Count 2); unfair competition (Count 4); and unfair and deceptive trade practices (Count 5).  This claim, too, fails because plaintiff cannot establish any of the underlying conduct on which the

claim relies.  With respect to misappropriation, the jury decided this issue against

plaintiff.  With respect to unfair competition, the complaint is devoid of any allegation

and the record is devoid of any proof that defendant has engaged in "palming off," or

any other conduct likely to result in consumer confusion.  With respect to unfair and

deceptive trade practices, that claim—as explained above—was also derivative of

other, underlying claims and thus also failed once the underlying claims were

eliminated.

Plaintiff argues that even if it cannot prove any wrongful underlying conduct on

the part of defendant, it may still pursue Count 6 because even "[a]n innocent recipient

may be liable for unjust enrichment."  (Pl.'s Opp. 24).  The cases on which it relies,

however, are distinguishable.  In <u>Jensen v. Daniels</u>, 57 Mass. App. Ct. 811, 818 (2003),

the court noted that an innocent recipient might be held liable, but held that such

liability was not applicable where defendant had not been given "fair notice that the

plaintiff was seeking restitution . . . under an 'innocent recipient' theory."  Plaintiff has

never alleged that defendant was "innocent" in any aspect of this case; the "innocent

recipient" theory thus does not apply.  As for <u>Branch v. FDIC</u>, 825 F. Supp. 384, 411-12

(D. Mass. 1993), that case concerns unjust enrichment arising out of breach of a

fiduciary duty and is thus inapposite here.  Accordingly, the motion is allowed on Count

6.

IV.     <u>Corruption of Fiduciary (Count 7)</u>

Count 7 is less of an affirmative claim than a response to a defense that plaintiff

anticipates defendant will make.  Plaintiff anticipates that defendant—in response to

plaintiff's various tort claims—will "assert[] that it received [plaintiff's] trade secrets and confidential information from individuals that it knew had a fiduciary relationship to [plaintiff]." (Am. Compl. ¶ 56).  Plaintiff objects to the possibility that defendant will raise this defense by (1) "den[ying] that individuals who had a fiduciary relationship with [plaintiff] gave trade secrets or confidential information to [defendant]," while simultaneously (2) accusing defendant—to the extent that it did obtain such information from plaintiff's fiduciaries—of having corrupted said fiduciaries.  (Id. ¶¶ 56-57).  It is inconsistent for plaintiff to assert that none of its fiduciaries breached their duties while at the same time accusing defendant of having induced a breach.  Plaintiff cannot prove its claim without first showing a breach, and it cannot show a breach as long as it denies a breach.  Accordingly, the motion is allowed on Count 7.

V.      Attempt to Monopolize and Monopolization (Counts 8 and 9)

        Count 8 alleges attempt to monopolize the histology market, the back end histology market, and the three staining submarkets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  Count 9 alleges monopolization of the back end histology market and the three staining submarkets.  To establish attempt to monopolize, plaintiff must prove that defendant (1) engaged in predatory or anticompetitive conduct, (2) acted with a specific intent to monopolize, and (3) had a dangerous probability of achieving monopoly power through that conduct, which in turn requires analysis of the relevant market and the defendant's ability to "lessen or destroy competition in that market." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993).  To establish monopolization, plaintiff must prove that defendant (1) possesses monopoly power in

the relevant market, and (2) willfully acquired or maintained that monopoly power

through anticompetitive conduct.  United States v. Grinnell Corp., 384 U.S. 563, 570-71

(1966).

      A.    Market Definition

      Market definition is a key element of both counts, since a monopolization claim

requires proof of monopoly power in the relevant market, and an attempted

monopolization claim requires proof of a dangerous probability of achieving such

power.  Plaintiff has limited its definition of the relevant market and submarkets to

automated staining devices.  Defendant argues that manual and semi-automated tests

are treated as "reasonably interchangeable [with automated tests] by consumers for the

same purposes," and thus must be considered part of the relevant market.  United

States v. E.I. duPont de Nemours & Co., 351 U.S. 377, 395 (1956).  Defendant

contends that as long as manual and semi-automated products provide some level of

constraint on automated devices, they must be included in the relevant market and

even notes that some consumers have switched from automated tests to manual tests.

      As plaintiff notes, however, products that are interchangeable in a broad sense

may not "meet the interchangeability test" used by courts in defining the relevant

market.  United States v. Grinnell Corp., 384 U.S. 563, 574 (1966).  While manual and

semi-automated tests may be interchangeable with automated tests in a broad sense, it

is unclear that consumers view the two categories of devices as separated only by the

"low degree of differentiation required of substitute . . . products."  Id.  Differences in

"utility, efficiency, reliability, responsiveness, and continuity" can be significant.  Id.  In

6

this case, the record contains evidence that manual staining is "inconsistent," "time-consuming," "expensive," and "very messy." (Pl.'s Ex. 86, at 169-70; Ex. 101, at A173). By contrast, automated staining has such advantages as "[e]ase of use, reproducibility, quality, reliability, lack of . . . variation, cost, lack of trained technologist required to perform assays, turnaround time advantages." (Pl.'s Ex. 85, at 183-84). Indeed, the benefits of automated staining are the foundation of defendant's business strategy. (Pl.'s Ex. 8, at V0144393 (defendant's SEC filing noting advantages of automated devices)). At the very least, plaintiff has presented evidence that automated tests constitute a "well-defined submarket[]," since it has "peculiar characteristics or uses," "distinct prices," and "unique production facilities." Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962). Market definition is a factual question. Coastal Fuels of P.R., Inc. v. Carribean Petroleum Corp., 79 F.3d 182, 196 (1st Cir. 1996). In this case, plaintiff has presented evidence from which a reasonable jury could conclude that the relevant market did not include manual or semi-automated tests. Accordingly, summary judgment on the basis of market definition is inappropriate.[1]

    B.    Anticompetitive Conduct

    Assuming that plaintiff is able to demonstrate monopoly power, it must also show that defendant acquired or maintained that power through exclusionary conduct. See Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227, 230 (1st Cir. 1983). "Exclusionary conduct is conduct, other than competition on the merits or restraints

---

[1]Defendant does not dispute that, if the market is limited to automated devices, it possessed monopoly power.

reasonably necessary to competition on the merits, that reasonably appears capable of making a significant contribution to creating or maintaining monopoly power." Id. (internal quotation marks omitted).

Defendant correctly argues that plaintiff cannot rely on its allegations of misappropriation, since the jury rejected plaintiff's misappropriation claims.  Defendant further correctly notes that plaintiff cannot rely on the BioTek acquisition as basis for recovery because that transaction falls outside of the statute of limitations.  Even without these allegations, however, plaintiff has raised a triable issue of fact on the issue of exclusionary conduct.  Specifically, the record contains evidence that defendant entered the Special staining submarket for the purpose of protecting its monopoly position in the IHC submarket and in the automated staining market more generally.  Before 1997, when defendant first learned of plaintiff's plans to enter the Special stains submarket, defendant had considered and decided against entering that market, believing it was not profitable enough.  (Pl.'s Ex. 12, at V014308; Ex. 89, at 108).  Once it learned of plaintiff's plans to enter the Special stains submarket and eventually to enter the IHC submarket, however, defendant rapidly reevaluated its position.  Defendant quickly developed and launched a Special staining test and placed high priority on becoming a first mover in that submarket, in order to "hold off the newcomers."  (Pl.'s Ex. 100, at 35).  Record evidence indicates that defendant entered the Special stains market not only to gain a predominant share of that submarket and thereby impede plaintiff's entry, but also to prevent plaintiff from successfully entering the IHC submarket, where defendant was already dominant.  (Pl.'s Ex. 98, at 162-63).

8

The idea that a dominant market player might try to maintain its monopoly in one market by precipitously entering a related submarket—and thereby preventing potential competitors from gaining a foothold in either market—is not new to antitrust law.  See, e.g., Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc., 627 F.2d 919, 926 (9th Cir. 1980) (Hunt sufficiently alleged anticompetitive conduct where it alleged that (1)  Ragu dominated spaghetti sauce market, and (2) when Ragu learned that Hunt planned to introduce a new, chunky sauce, Ragu precipitously entered that market).  A reasonable jury could find that defendant's decision to enter the Special stains market, which it had previously eschewed, and its stated desire to thereby maintain its monopoly in the IHC and larger automated staining market constituted exclusionary conduct.  See Columbia Metal Culvert Co. v. Kaiser Aluminum & Chem. Corp., 579 F.2d 20, 31 (3d Cir. 1978) (jury could infer that defendant sought to drive plaintiff out of business where defendant originally planned to open a plant in Virginia, but upon learning of plaintiff's decision to buy from another supplier, rather than defendant's parent, defendant decided instead to locate plant in plaintiff's "backyard").

The record also contains evidence that when defendant did enter the Special stains submarket, it did so with a device that had a high out-of-box failure rate (reaching 64% in one month), resulting in a large number of returns.  (Pl.'s Exs. 37, 71).  Defendant's chief executive described the quarterly results for the period in which the new device was launched as "a complete disaster."  (Pl.'s Ex. 71).  Indeed, defendant apparently recognized the risks associated with premature launch of its Special staining device, since sales employees were instructed to initially target "only accounts

9

where we can afford to embarrass ourselves," were cautioned about "fail[ure] in our biggest accounts," and were thus advised to "be selective about who we expose our weaknesses to." (Pl.'s Ex. 33). While the high failure and return rates might very well have been due to routine "'start up' problems" (id.), a jury might also conclude that defendant had prematurely launched the product, "against its business interests," in an attempt to prevent plaintiff from entering the back end histology market and to thereby preserve its monopoly. Columbia Metal Culvert Co., 579 F.2d at 31.

At trial, of course, defendant may well prevail by showing that the alleged conduct did not harm competition. See Data General Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1182 (1st Cir. 1994) (antitrust laws condemn only conduct that harms competitive process and not conduct which simply harms competitors). Plaintiff has offered little other convincing evidence of exclusionary conduct on defendant's part. To the extent that Counts 8 and 9 relied upon plaintiff's allegations of misappropriation or the BioTek acquisition, the claim is barred. In addition, many of plaintiff's factual allegations and exhibits concern defendant's desire, expressed in its internal sales and marketing documents, to quash the competition and, specifically, plaintiff. But "the desire to crush a competitor, standing alone, is insufficient to make out a violation of the antitrust laws." Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of Rhode Island, 883 F.2d 1101, 1113 (1st Cir. 1989). On defendant's summary judgment motion, however, I draw all reasonable inferences in plaintiff's favor. Defendant's sudden change of heart with respect to the Special staining submarket and its rapid entry into that submarket raise triable issues of fact on

the issue of exclusionary conduct and therefore preclude summary judgment on Counts 8 and 9.

VI.    <u>Lanham Act (Count 10)</u>

Count 10 alleges that defendant made false or misleading representations of fact regarding "attributes of [plaintiff's] products, attributes of [defendant's] products, the identity of customers of [defendant's] products and the identity and affiliation of individuals associated with [defendant]," in violation of the Lanham Act, 15 U.S.C. § 1125(a).  To establish a false advertising claim, plaintiff must demonstrate, <u>inter alia</u>, that it "has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products." <u>Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Avenue</u>, 284 F.3d 302, 310-11 (1st Cir. 2002).  Plaintiff has presented no evidence of such harm.  Plaintiff contends that it need not present evidence of harm because the disputed statements are literally false. (Pl.'s Opp. 23-24).  Plaintiff misstates the law.  Where the disputed statements are false on their face, a Lanham Act claimant need not prove "consumer deception."  <u>Id.</u> at 311. Injury to the plaintiff, however, is an entirely separate element.  <u>See id.</u> at 310-11 (plaintiff must prove, <u>inter alia</u>, both consumer deception and harm to plaintiff's business).  Because plaintiff has failed to raise a triable issue of fact with respect to an essential element of its Lanham Act claim, summary judgment on Count 10 is allowed.

VII.    <u>Conclusion</u>

Defendant's motion for summary judgment (Docket #327) is allowed on Counts 4, 5, 6, 7, and 10, and denied on Counts 8 and 9.

Plaintiff's motion to supplement the summary judgment record (#363) is denied.

Not only is plaintiff's effort to supplement the record untimely, since discovery closed in 2002, it additionally seeks to reopen a topic—whether or not defendant misappropriated or otherwise improperly obtained plaintiff's confidential information—that was adjudicated by the jury and resolved in defendant's favor.

Defendant's motion for leave to file a reply (#323) is denied as moot.

Plaintiff's motion for leave to file a reply (#375) is denied as moot.


|       07/20/06       |  /s/ Rya W. Zobel                   |
| DATE | RYA W. ZOBEL |
|  | UNITED STATES DISTRICT JUDGE |